[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The Department of Children and Families (DCF) has filed a termination of parental rights petition concerning Esmeraldo H. (a.k.a. "Angel" H.), a minor child whose date of birth is March 11, 1984. The child's biological father, Pedro B., is named as the respondent in this action. The biological mother, Christine H., is deceased.[1]
Pursuant to the applicable subsections of C.G.S. § 17a-112
(b), the petitioner has alleged two statutory grounds for termination: parental failure to rehabilitate, and acts of CT Page 6004 omission or commission which have denied the child the care, guidance or control necessary for his physical, educational, moral or emotional well being.[2] DCF has also alleged, with respect to each count, that the grounds for termination have existed for a period of time in excess of one year.
PROCEDURAL CONTEXT
DCF was awarded temporary custody of Esmeraldo by the Superior Court for Juvenile matters in Hartford on May 13, 1993. The petitioner sought the OTC after the child was stabbed by Pedro B. during a domestic dispute on May 11, 1993. Esmeraldo was adjudicated a neglected and uncared for child by the court in Hartford on September 30, 1993. He was committed to the petitioner's care and custody for a period of 18 months on that date. The commitment was subsequently extended by the court on January 3, 1995 and September 5, 1996. The child has remained in state custody continuously from the date the OTC was signed through the present.
The termination petition was filed at the Superior Court for Juvenile Matters in Hartford on November 6, 1996. The case was subsequently transferred to this venue for trial.
The trial was held on April 21-22, 1997 at the Child Protection Session in the Middletown Judicial District courthouse. Following the completion of evidence and testimony, the parties requested permission to submit memoranda of fact and law, which were received by the court on May 20, 1997. The respondent was present in court and represented by his attorney throughout the entire proceeding. DCF and the minor child were represented by their respective counsel during the trial.
The petitioner submitted nine full exhibits into evidence and introduced the testimony of the following witnesses during the trial:
1. Linda Prince, Department of Corrections counselor;
2. Dr. David Mantell, psychologist;
3. Sgt. Brian J. Heavren, Hartford Police Department;
4. Mark Meserve, DCF social worker: CT Page 6005
5. Caroline Hansen, clinical therapist, Children's Center;
6. Marlon Rozie, DCF social worker.
Counsel for the minor child offered one exhibit, but did not introduce the testimony of any witnesses. Counsel for the respondent father did not offer evidence or testimony.
FACTUAL FINDINGS
The court, having carefully considered all of the evidence and testimony adduced at trial, makes the following factual findings:
Esmeraldo received a stab wound to his upper chest/right shoulder region on May 11, 1993. This occurred during a domestic argument between Christine H. and Pedro B. at the apartment where the mother and child resided. (Petitioner's Exhibit 4A, Pages 1-3). The mother told Hartford police that Pedro B. arrived at the apartment in an angry and intoxicated state. The father argued with the mother, and during the course of that confrontation threw a butcher knife at her. Sergeant Brian J. Heavren of the Hartford Police Department testified that he estimated the knife to be seven or eight inches long, with a blade that was twice the width of a regular steak knife. The knife struck and wounded Esmeraldo, who was then nine years old. Pedro B. was apprehended hiding under a pile of clothes in the apartment building by Sergeant Heavren, and arrested. The child was taken by ambulance to Hartford Hospital, where he was admitted for treatment of the laceration. Esmeraldo was hospitalized there until May 13, 1993,[3] when he went into foster care.
As noted above, the child was committed to DCF on September 30, 1993. On that date Pedro B. signed court-approved expectations.[4] They provided that he would: keep all appointments set by or with DCYS[5]; keep his attorney and the petitioner advised of his whereabouts; visit the child as often as permitted; participate in parenting, individual and drug/alcohol counseling; enroll in a family violence program upon release from prison; secure and maintain adequate housing and income; refrain from substance abuse; and have no further involvement with the criminal justice system. (Court Record, Expectation Form dated September 30, 1993). CT Page 6006
On November 1, 1993, Pedro B. was convicted at the Superior Court in Hartford on charges stemming from the incident in which Esmeraldo was wounded. He plead to felony counts of risk of injury to a minor and assault second degree, and received a total effective sentence of 10 years' incarceration, suspended after five years to serve, and three years' probation. Pedro B. has been in custody continuously from the date of his conviction through the date of this trial. He is expected to be released from prison this coming August.
After the father was incarcerated, DCF brought Esmeraldo to visit him in prison. Per DCF social worker Mark Meserve, Esmeraldo initially expressed the desire to see his father. The social worker testified that Pedro B. wanted visitation with his son, and pursued it to the best of his ability. Mr. Meserve stated that he accompanied the child on prison visits three or four times. He stated that the visits between Pedro B. and Esmeraldo were "awkward" and opined that this may have been due to the fact that they were held in a large, open visiting hall at the prison. At one point, Mr. Meserve asked the father to apologize to the child for causing his injury. The social worker requested this in order to facilitate the healing process which he hoped would result if the father took responsibility for his actions. Mr. Meserve testified that Pedro B. was initially upset with the worker's suggestion. According to Mr. Meserve, the father subsequently wrote Esmeraldo letters in which he expressed sorrow about the situation in general, but never directly apologized for injuring the child. The social worker admitted on cross examination that he did not read every letter which Pedro B. sent to his son, and that it was possible that the father did apologize to Esmeraldo in subsequent correspondence. However, it is apparent from Mr. Meserve's testimony, and from Pedro B.'s own statement to Judge Francis Foley at the neglect hearing on September 30, 1993 (See Petitioner's Exhibit 2, Pages 5-7), that the father minimizes his role in the incident, and fails to grasp the full extent of the trauma which his conduct has inflicted on Esmeraldo.
DCF social worker Marlon Rozie, who has been the social worker on this case from April 1995 until the present, accompanied the child on one visit to see his father. The social worker testified that the child seemed to be comfortable during this visit, and that Pedro B. appeared excited about seeing his son. Mr. Rozie also stated that nothing inappropriate occurred during the visit. The social worker testified that Pedro B. sent CT Page 6007 him three or four letters for Esmeraldo. He said that Pedro B. seemed interested in the child and wanted to see him.
On April 12, 1996, Esmeraldo asked the social worker to discontinue visitation with his father. He did not tell Mr. Rozie why he wanted these contacts stopped. On May 3, 1996, the child again stated to Mr. Rozie that he no longer wished to see his father. This time, Esmeraldo told the social worker that he was afraid Pedro B. might hurt him again. Mr. Rozie suspended the visits in April 1996. The child has not seen his father since the visits were terminated last year. The social worker believed at first that Esmeraldo might change his mind, but this did not happen. Mr. Rozie testified that the child made it clear that he no longer wished to visit with his father. Pedro B. requested an administrative hearing to challenge the suspension of his contacts, and one was scheduled by DCF. On the date it was scheduled to be held, the father's counsel indicated that Pedro B. did not wish to go through with the hearing.
Due to Pedro B.'s continuous incarceration, DCF was unable to provide services — with the exception of visitation — to the respondent. Based on the court-approved expectations and the evidence and testimony adduced at this trial, the court finds that Pedro B. needed psychological, substance abuse, and domestic violence programs or counseling. There were also evidence and testimony at trial, which the court finds to be credible, that those services were available to the respondent at various times in the correctional institutions where he has been incarcerated since November 1, 1993.
Pedro B. was imprisoned at the Walker Reception facility from November 3, 1993 until December 13, 1993. During that time he was offered a mandatory 90-minute substance abuse education class and weekly Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) meetings. He attended the mandatory drug class but did not participate in any of the 12-step meetings. (Petitioner's Exhibit 7, Page 4). The respondent was an inmate at the Garner Correctional Institution from December 13, 1993 until December 29, 1993. He did not participate in AA or NA meetings which were offered there. (Petitioner's Exhibit 7, Page 4). Pedro B was held at the Osborne Correctional Institution from December 29, 1993 until January 27, 1994, from May 8, 1995 until August 30, 1995 and from August 27, 1996 until September 26, 1996. He did not participate in any AA or NA meetings during these periods, nor did he participate in the Tier II and Tier IV rehabilitation CT Page 6008 programs offered at this facility. (Petitioner's Exhibit 7, Page 4).
The father was incarcerated at the Cheshire Correctional Institution from January 27, 1994 until May 18, 1994, and again from January 9, 1996 until August 27, 1996. He did not attend any AA or NA meetings, or participate in the Tier II program while at Cheshire. (Petitioner's Exhibit 7, Page 5). Pedro B. was held at the McDougall Correctional Institution from May 18, 1994 until May 8, 1995. He enrolled in and successfully completed the Tier II program offered at this facility, but did not take advantage of the AA and NA groups there. (Petitioner's Exhibit 7, Page 5).
Pedro B. was incarcerated at the Enfield Correctional Institution during the period from August 30, 1995 until January 9, 1996. This facility offered the Tier III program and AA and NA fellowship meetings. The father did not participate in Tier III. He attended AA meetings on Mondays from September 25, 1995 until November 14, 1995. Department of Correction records indicated that Pedro B. was taken off the meeting list for "poor attendance." (Petitioner's Exhibit 7, Page 5).
The respondent was in custody at the Brooklyn Correctional Institution from September 26, 1996 until November 26, 1996. The Tier III program, as well as AA and NA meetings were available to him there. A staff member at Brooklyn CI indicated that Pedro B. was "unmotivated for treatment." (Petitioner's Exhibit 7, Page 5). The respondent told counselors there that he had participated in treatment at McDougall and was not interested in participating at Brooklyn. He was not involved in any substance abuse programs or other rehabilitative programs at this facility. (Petitioner's Exhibit 7, Page 5). At Brooklyn C. I., Pedro B. was assessed with a treatment score of four. Linda Prince, a correctional counselor with the Department of Corrections, testified during this trial that a treatment score of four indicates an inmate with a severe alcohol abuse problem.
Pedro B. is presently incarcerated at the Carl Robinson Correctional Institution. He was transferred there on November 26, 1996. A domestic violence group, AA and NA meetings, and the Tier II and Tier IV are offered to inmates there. The respondent has not requested, nor participated in, any of these services.
Petitioner's Exhibit 7 also detailed Pedro B's participation with mental health services offered by the Department of CT Page 6009 Corrections. The exhibit indicated that the respondent was seen by mental health units (MHUs) at the various correctional facilities 11 times during the period from May 8, 1993 through November 28, 1996. It also established that Pedro B. failed to cooperate with this type of treatment on several occasions. The respondent requested a mental health unit appointment on September 22, 1993, but refused an MHU counseling session on September 29, 1993. On July 19, 1993, Pedro B. failed to keep a scheduled "one to one appointment." Four days later — on July 23, 1993 — he was called for MHU evaluation, but "refused to report." The respondent also failed to keep MHU appointments on February 28, 1995, April 4, 1995, May 5, 1995 and September 1, 1995. (Petitioner's Exhibit 7, Page 2).
DCF social worker Mark Meserve testified that Pedro B. never requested that he intercede with corrections officials to obtain any services for him. Marlon Rozie, the other DCF worker assigned to the case, provided similar testimony. He stated that with the exception of requests for visitation, the respondent father never asked him for additional services, nor for intervention with the Department of Corrections to solicit services from that agency.
Christine H., the child's biological mother, died in an automobile accident in January 1995. Although there was conflicting testimony on this issue at trial, Esmeraldo is aware that his mother is dead. The child has an older brother, Chris M., who is 18. Esmeraldo is attached to his brother and wishes to visit him.
Esmeraldo has been in six different placements since the OTC was granted. He has been at the Children's Center in Hamden since July 1996. This is a residential facility. The child receives on-going clinical therapy there from Caroline Hansen.
ADJUDICATION (Based on facts as of November 6, 1996)
 1. Parental failure to rehabilitate: The law pertaining to this statutory ground for termination of parental rights is set forth in C.G.S. § 17a-112 (b)(2). The statute applies in those cases where:
 "the parent of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a CT Page 6010 reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child".
As used in the forgoing statute, the term "personal rehabilitation" has been defined by Connecticut case law to mean the restoration of a person to his or her former constructive and useful role as a parent. In re Migdalia M., 6 Conn. App. 194,203, 504 A.2d 532 (1986). In cases where parental failure to rehabilitate is alleged, the court is required to "analyze the respondent's rehabilitative status as it relates to the needs of the particular child" and also to determine whether or not such rehabilitation can occur "within a reasonable time." In reFelicia D., 35 Conn. App. 490, 500, 646 A.2d 862 (1994); In reLuis C., 210 Conn. 157, 167, 554 A.2d 772 (1989).
The respondent argued, both at hearing and in his post-trial brief, that he has rehabilitated, and that a termination of his parental rights is not warranted. He also contended that DCF's failure to offer him services, his frequent transfers within the correctional system, and the lack of services available to prisoners impeded his rehabilitative efforts:
 "The stark reality of the Respondent's position as an incarcerated individual is that there are not a variety of programs made available to inmates to assist them in their rehabilitation. Perhaps the department [DCF] desires a greater improvement but, the record establishes through the testimony of the social workers that no services were provided to the respondent. It cannot be overlooked that the Respondent has made strides in effort[s] to correct his substance abuse while incarcerated under adverse circumstances." (Respondent's post-trial memorandum, page 5).
The court is unpersuaded by these arguments. It is true that Pedro B. has now been imprisoned for nearly four years as a result of his criminal conviction for injuring Esmeraldo. It is also a fact that the respondent's incarceration prevented the petitioner from providing him with the community-based services it offers to parents who are not in custody. But the evidence at trial also established that Pedro B. failed to recognize the nature and extent of his substance abuse, and to take advantage of many services and programs which were within his grasp.
Pedro B. has a serious alcohol abuse problem, and was CT Page 6011 intoxicated during the incident when his son was injured. The expectation form which the respondent signed when Esmeraldo was adjudicated as a neglected child on September 30, 1993 put the father on notice that substance abuse counseling was a prerequisite to reunification. Despite all of the forgoing, Pedro B. missed numerous opportunities over the past three and a half years to attend prison-sponsored AA and NA sessions. His brief participation in some 12-step meetings during 1995 at Enfield C.I. ended after he was dropped from the program for lack of attendance. He rebuffed substance abuse treatment at Brooklyn C.I., and was found by staff there to be unmotivated for treatment. During me course of his incarceration, he has failed to keep six mental health unit appointments. Although Pedro B. did complete the Tier II program, he ignored a number of other programs which the corrections department offered, including the Tier III and Tier IV and domestic violence programs. The respondent cannot blame his situation on an alleged lack of services and programs when, as the court now finds, he squandered or ignored the significant rehabilitative opportunities which were made available to him.
The petitioner's initial plan in this case was to seek reunification between Pedro B. and Esmeraldo. DCF social workers transported the child for visits with the father in prison. Mr. Meserve also suggested that the respondent apologize to his son in order to effectuate healing and reconciliation. Although DCF made a meaningful effort to help the respondent rebuild a bridge of trust with his son, the chasm proved too great. Pedro B. was unable to allay the child's fears, and visits were ultimately stopped after Esmeraldo informed his social worker that he no longer wanted contact and was afraid that his father might hurt him again.
Based upon all of the forgoing, the court finds that DCF has proven by clear and convincing evidence that Pedro B. has failed to rehabilitate as alleged in the termination petition. Esmeraldo is now 13 years old and has been in state foster care for four years. The child articulates fear of the respondent and a desire not to visit with him. Given the age and needs of this child, the court also finds by clear and convincing proof that Pedro B. could not assume a responsible position in Esmeraldo's life within a reasonable time. The court also finds that this statutory ground for termination has existed for a period of time which is not less than one year. CT Page 6012
2. Acts of omission or commission: D.C.F. has also plead an allegation under C.G.S. § 17a-112 (b)(3). This section of the statute authorizes the court to find grounds for termination when clear and convincing evidence establishes that:
 "the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being."
An adjudication under this ground "requires proof of specific conduct that has caused serious injury to a child." This specific conduct can be proven through direct or circumstantial evidence.In re Emmanuel M., 43 Conn. Sup. 108, 648 A.2d 904 (1994), affirmed 35 Conn. App. 276, 648 A.2d 881, cert. denied231 Conn. 915, 648 A.2d 151. The term "serious injury" refers to either serious physical injury or to serious emotional injury which may be sustained by a child. In re Kezia M., 33 Conn. App. 12,632 A.2d 1122 (1993), cert. denied 228 Conn. 915, 636 A.2d 847.
In the present case, the court finds that Pedro B.'s actions on May 11, 1993 inflicted both types of serious harm upon Esmeraldo.
The nine-year-old child sustained a "gaping" wound to his right chest and shoulder region. (Petitioner's Exhibit 6).[6]
The laceration was not sutured, because an attending pediatric surgeon determined that the wound should be left open. One notation in the Hartford Hospital records indicates that the knife probably penetrated the child's "AC joint." (Petitioner's Exhibit 6). Esmeraldo was admitted to Hartford Hospital and was a patient there from May 11-May 13, 1993. During the course of this hospitalization, the child was given several different types of medication. His arm was placed in a sling and x-rays for frontal and lateral views of the chest region were taken. A Hartford Hospital nursing progress note dated May 12, 1993 refers to "drainage" from his right shoulder. A reference to "receiving IV" in the same nursing note leads the court to conclude that Esmeraldo received some type of intravenous therapy or medication. (Petitioner's Exhibit 6). A Hartford Hospital surgical record dated May 11, 1993 states that the child could move his right arm with pain "but cannot move shoulder."[7]
(Petitioner's Exhibit 6). The hospital's discharge instructions warned about the symptoms of infection. CT Page 6013
The respondent's counsel, citing the language of C.G.S. § 53a-3 (4), urges the court to find that Esmeraldo's injury was not serious. The court does not agree. The age of the child, the nature of the wound, the manner in which it was inflicted, the pain and impairment it caused, and the treatment which it required, all prove that this was a serious physical injury.
The court also finds that Esmeraldo suffered serious emotional injury as a result of Pedro B.'s actions. He was stabbed by a lethal weapon as he observed his father attempt to attack his mother. A psychiatrist who examined the child at Hartford Hospital wrote in his May 12, 1993 report that the "risk of post traumatic stress disorder is high, not only due to injury, but [also due] to witnessed domestic violence between parents." (Petitioner's Exhibit 6).
As noted above, Esmeraldo has been in residential placement at the Children's Center since July 1996. He receives ongoing therapy there from Ms. Hansen. The clinical therapist testified during this trial that although Esmeraldo frequently refuses to talk about his father, he has told her about different incidents when he was hit by Pedro B. She also stated that the child is frightened by his previous life experiences, and has expressed fear that he will again be physically hurt by his father. It is obvious to the court that the May 11, 1993 incident psychologically traumatized the child, and that evidence of that serious emotional injury is still apparent today.
The father's actions have required Esmeraldo to spend the past four years in state custody, and the last year in a residential facility where he receives ongoing clinical therapy. Because of his misconduct, Pedro B. has been continuously incarcerated — and hence unable able to provide care and support for the child — since 1993.
Based on all of the forgoing, the court finds that the petitioner has proven by clear and convincing evidence that the father's acts and omissions have denied Esmeraldo the care, guidance and control necessary for his physical, educational, moral and emotional well-being. The court also finds by clear and convincing evidence that this ground for termination has existed for a period of time longer than one year.
DISPOSITION
CT Page 6014
Because the petitioner has proven the grounds alleged for termination of parental rights, the court now addresses the issue of disposition. During this phase of the proceeding, DCF must prove by clear and convincing evidence that a termination would be in the child's best interests.
At the request of the petitioner, Esmeraldo was evaluated by Dr. David Mantell, a licensed psychologist. Dr. Mantell was retained by DCF to evaluate the child's mental health. He did not conduct an assessment of the parent-child relationship, nor observe Esmeraldo interact with Pedro B. Dr. Mantell testified during this trial, and reports of his evaluations were entered into evidence. (See Petitioner's Exhibit 5, Child's Exhibit 1). The court has considered Dr. Mantell's testimony and reports only in connection with the dispositional phase of this proceeding. His report under date of January 3, 1996 indicates that Esmeraldo has a full-scale IQ of 71 and tests "in the educably mentally retarded range." (Petitioner's Exhibit 5, Pages 1-2). During an April 1997 evaluation, Dr. Mantell administered Rorschach tests and the Reynold's Child Depression Survey to Esmeraldo. The results indicated the child's "very strong underlying distress."
 "Violence and morbidity figure very strongly in his Rorschach responses. People and animals are shot, killed, often shot multiple times, with dripping blood, pieces of meat that are ripped off, the psychological image of a very angry, agitated, and restless child attempting to manage strong conflict, tension and anger. His TAT themes include a little boy who is sad because he's worried about his family after running away, a woman who is just shot randomly by a gun and dies, one lady choking another, and two sad children thinking about their family." (Child's Exhibit 1, Page 2).
Dr. Mantell noted during his testimony in court that the violent images in Esmeraldo's projective testing indicate that the child has violence on his mind, and that these thoughts reflect a significant part of his underlying psychological makeup. The psychologist found it unlikely that the multiple violent images projected in the Rorschach tests resulted from the child watching a scary movie. Instead, Dr. Mantell believes that Esmeraldo has had personal experience "of a very direct kind" that is still bothering him.
Dr. Mantell referred to the incident on May 11, 1993 as being CT Page 6015 a "Grade A, double trauma" for Esmeraldo. Like the psychiatrist at Hartford Hospital who examined Esmeraldo shortly after the stabbing, Dr. Mantell believes that the child was traumatized not only because he was injured by his father, but also because he witnessed Pedro B. attempt to stab the mother with a knife.
Dr. Mantell concluded his April 18, 1997 report by noting:
 "I think this child will be in need of support services for the indefinite future. In view of the fact that this child is effectively orphaned on account of his mother's death and the combination of his father's unavailability and his rejection of his father, I would hope that the Court would be able to assist him to move on in life and to find an alternate family support system." (Child's Exhibit 1, Page 3).
The court accepts the findings and conclusions of Dr. Mantell as fact. His evaluation clarified the nature of Esmeraldo's fears, and the depth of the psychological trauma which the child has experienced.
Esmeraldo had five prior foster care placements before going to the Children's Center in July 1996. (Petitioner's Exhibit 1, Page 5). He resided in the foster home of Janet C. from August 21, 1995 until June 21, 1996. That placement ended because Janet C. felt she could no longer handle the child. The DCF social study which was prepared in connection with this case notes that: "This decision may have been precipitated by the fact that [Esmeraldo's] brother left this home on bad terms. His relationship with the family is strained and foster mother has not wanted to cooperate with visitation between the brothers." (Petitioner's Exhibit 1, Page 5). Sadly, Dr. Mantell determined in his evaluation that Esmeraldo regarded Janet C. as his psychological parent.
Caroline Hansen, Esmeraldo's therapist at the Children's Center, testified that the child has articulated the desire to be adopted. She opined that if a termination was granted, an adoption would be in Esmeraldo's best interests, because he needs the stability of a permanent home. Marlon Rozie, the DCF social worker, testified that Esmeraldo told him that he would like to be adopted by a family where he could play sports. Mr. Rozie believes that the child is "adoptable." CT Page 6016
Esmeraldo is a 13-year-old child has endured numerous tragedies and hardships during his young life. These have included the death of his mother, the very traumatic episode in which he was injured by his father, Pedro B.'s long-term incarceration, separation from his sibling, and multiple placements. Esmeraldo has clearly indicated to the professionals in this case that he is afraid of Pedro B., does not want contact with him, and wishes to be placed for adoption. Mr. Rozie, Dr. Mantell, Ms. Hansen, petitioner's counsel and counsel for the minor child all advocate that a termination would be in the child's best interests. During the four years that Esmeraldo has spent in state care, Pedro B. has failed to achieve a sufficient degree of personal rehabilitation. He has also been unable, despite visitation, to reestablish a positive relationship with the child. It would be unfair to Esmeraldo, who needs and longs for a permanent home, to allow the respondent further time to pursue reunification.
Before this court may enter judgment, it is required by C.G.S. § 17a-112 (d) to make and consider the following findings:
1. Services offered: DCF facilitated visits between Pedro B. and Esmeraldo at the correctional facilities where the father was being held. The visits terminated in 1996 after the child informed his worker that he was afraid of the respondent, and no longer wished to have contact with him. Pedro B. had the opportunity to participate in rehabilitative services and programs offered to him by the Department of Corrections, but largely failed to do so. The DOC programs included AA and NA meetings, the Tier programs, and a domestic violence program. The court finds by clear and convincing evidence that DCF and the Connecticut Department of Corrections offered appropriate rehabilitative and reunification services to the respondent.
2. Reasonable efforts to reunite: DCF's initial long-term plan in this case was parent-child reunification. The petitioner hoped that this goal could be achieved through visits, and via the DOC services referred to above. The court finds as proven by clear and convincing evidence that DCF made reasonable efforts to reunite Esmeraldo and Pedro B.
3. Court orders: No court orders were issued in this case. Court-approved expectations were signed by the respondent on September 30, 1993 when Esmeraldo was committed to DCF by the CT Page 6017 Superior Court for Juvenile Matters in Hartford. They noted, inter alia, that the father was expected to cooperate with individual and substance abuse counseling. As indicated above, this court has found that the father did not pursue many of the drug/alcohol treatment services which were made available to him.
4. Feelings and emotional ties with parents and caretakers:
The child's mother is deceased. The child has had visits with Pedro B. and obviously knows him. Although the initial contacts were acceptable, the child indicated to his social worker in 1996 that he did not wish to have further visits with his father. Esmeraldo informed both Ms. Hansen and Mr. Rozie that he is frightened of Pedro B., and is afraid of being hurt by him again. The child has been in state care for four years, and has resided at the Children's Center in Hamden since July 1996. He regards Janet C., his former foster mother, as his psychological parent.
5. Age of child: Esmeraldo is 13 years old. His date of birth is March 11, 1984.
6. Parental efforts to adjust circumstances, conduct andconditions: Pedro B. diligently pursued visitation with his son, although he was not able to allay the child's fears, and the visits were ultimately terminated for this reason. He missed numerous opportunities while in prison to participate in substance abuse and other rehabilitative programs. The court finds that he has not made sufficient efforts to adjust his circumstances, conduct or conditions in order to make it in the best interest of Esmeraldo that he be returned to his father's care and custody in the foreseeable future.
7. Impediments to maintaining a meaningful relationship:
The petitioner initially facilitated visits between Pedro B. and Esmeraldo at the correctional facilities where the father was confined. Those visits were ended by DCF in 1996 because the child complained that he was afraid of the respondent and no longer desired contact with him. Under all of the facts and circumstances of this unfortunate case, the court finds that DCF's decision to end the visits was reasonable. Accordingly, the court finds that no unreasonable action by any individual or agency, and no adverse economic circumstance of any party, prevented Pedro B. from maintaining a meaningful relationship with Esmeraldo.
JUDGMENT AND ORDERS
CT Page 6018
Having considered the seven factors enumerated above, and having determined that the petitioner has proven the two grounds alleged for termination by clear and convincing evidence, the court further finds by clear and convincing proof that a termination of parental rights is in the minor child's best interests. Accordingly, it is hereby ORDERED that the parental rights of Pedro B. with respect to the minor child Esmeraldo H. be, and hereby are, terminated. It is further ordered that the Commissioner of the Department of Children and Families be appointed the statutory parent of said child for the purposes of placing him in adoption, or securing other appropriate permanent placement for him. Said commissioner shall file with the court, no later than 90 days following the date of this judgment, a written report of the progress made toward such permanent placement. If adoption has not been finalized by August 1, 1998, then said commissioner is further ordered to file a Motion for Review of Plan for Terminated Child, which shall be heard by the court no later than November 1, 1998. The court urges DCF to continue regular visitation between Esmeraldo and his older brother, Chris M.
Dated at Middletown, Connecticut this 28th day of May 1997.
BY THE COURT
DYER, J.